United States District Court
Southern District of Texas
ENTERED

OCT 20 2008

Michael N. Milby, Clerk of Court
By Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>    Plaintiff, | §<br>§<br>§ | |
| v. | §<br>§ | Civil Action No. 1:08-cv-169 |
| 1.16 ACRES OF LAND, more or less, situate<br>in CAMERON COUNTY, TEXAS; and<br>BORZYNSKI BROTHERS PROPERTIES,<br>    Defendants. | §<br>§<br>§<br>§ | |

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>    Plaintiff, | §<br>§<br>§ | |
| v. | §<br>§ | Civil Action No. 1:08-cv-193 |
| 0.26 ACRES OF LAND, more or less, situate<br>in CAMERON COUNTY, TEXAS; and<br>OSCAR CEBALLOS; ET AL.,<br>    Defendants. | §<br>§<br>§<br>§ | |

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>    Plaintiff, | §<br>§<br>§ | |
| v. | §<br>§ | Civil Action No. 1:08-cv-213 |
| 0.37 ACRES OF LAND, more or less, situate<br>in CAMERON COUNTY, TEXAS; and<br>TROY INVESTMENT COMPANY NO. 25;<br>ET AL.,<br>    Defendants. | §<br>§<br>§<br>§<br>§ | |

| UNITED STATES OF AMERICA, | § | |
|---|---|---|
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 1:08-cv-217 |
| | § | |
| 1.08 ACRES OF LAND, more or less, situate | § | |
| in CAMERON COUNTY, TEXAS; and | § | |
| DONALD F. PHILLIPP; ET AL., | § | |
| Defendants. | § | |

| UNITED STATES OF AMERICA, | § | |
|---|---|---|
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 1:08-cv-226 |
| | § | |
| 4.14 ACRES OF LAND, more or less, situate | § | |
| in CAMERON COUNTY, TEXAS; and | § | |
| RIO GRANDE PALMS WATER | § | |
| DISTRICT; ET AL., | § | |
| Defendants. | § | |

| UNITED STATES OF AMERICA, | § | |
|---|---|---|
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 1:08-cv-237 |
| | § | |
| 6.51 ACRES OF LAND, more or less, situate | § | |
| in CAMERON COUNTY, TEXAS; and | § | |
| DANIEL YTURRIA BUTLER; ET AL., | § | |
| Defendants. | § | |

| UNITED STATES OF AMERICA, | § | |
|---|---|---|
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 1:08-cv-293 |
| | § | |
| 1.18 ACRES OF LAND, more or less, situate | § | |
| in CAMERON COUNTY, TEXAS; and | § | |
| TRUSTEE ISIDORE F. BAUER; ET AL., | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, the United States of America, seeks estates in fee simple in the Defendant landowners' property pursuant to 40 U.S.C. § 3114 and 8 U.S.C. § 1103, as part of the Government's efforts to construct fencing and other infrastructure to secure the United States-Mexico border.  The landowners object to these takings based on recent amendments to 8 U.S.C. § 1103 note (Section 102(b)), contending that these amendments only permit the United States to take property "along the border" for the construction of fencing to secure the border.

The landowners assert that "along the border" means either on the border or touching the border[1], and that since none of the subject takings are either on the border or touching the border, the United States is not authorized to take their property under the amendments to 8 U.S.C. § 1103 note (Section 102(b)).

I.   STATUTORY AMENDMENTS LEADING TO REINSERTION OF "ALONG THE BORDER" LANGUAGE

A.   Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA")

Congress enacted IIRIRA in 1996 to give the Attorney General of the United States the authority to:

> contract for or buy any interest in land, including temporary use rights, *adjacent to or in the vicinity of an international land border* when the Attorney General deems the land essential to control and guard the boundaries and borders of the United States against any violation of this Act.

---

[1] In Texas, the international boundary between the United States and Mexico is the middle of the Rio Grande River. *See* Treaty to Resolve Pending Boundary Differences and Maintain the Rio Grande and Colorado River as the International Boundary, United States of America, Mexico, art. II(A), November 23, 1970.  The Court will discuss the implications of placing fencing both on the international boundary line as well as in the middle of a river as part of its analysis below.

1

Pub. L. No. § 104-208, § 102, 110 Stat. 3009, 3009-555 (emphasis added) (setting out what is currently codified at 8 U.S.C. § 1103(b)(1)).  IIRIRA also created a note to 8 U.S.C. § 1103 entitled "Improvement of Barriers at Border," requiring the Attorney General to:

> (a) . . . take such actions as may be necessary to install additional physical barriers and roads . . . *in the vicinity of the United States border* to deter illegal crossings in areas of high illegal entry into the United States.
>
> (b) CONSTRUCTION OF FENCING AND ROAD IMPROVEMENTS *IN THE BORDER AREA* NEAR SAN DIEGO, CALIFORNIA.- -
>
> (1) IN GENERAL.- - In carrying about subsection (A), the Attorney General shall provide for the construction *along the 14 miles of the international land border of the United States, starting at the Pacific Ocean and extending eastward, of second and third fences, in addition to the existing reinforced fence, and for roads between the fences*.

*Id.* at 3009-554 (emphasis added) (creating 8 U.S.C. § 1103 note (Section 102)).  In 2005, Congress amended 8 U.S.C. § 1103 note (Section 102(b)) through the Emergency Supplemental Appropriations Act for Defense, the Global War on Terror, and Tsunami Relief, 2005, giving the Secretary of Homeland Security the authority to "waive all legal requirements such Secretary, in such Secretary's sole discretion, determines necessary to ensure expeditious construction of the barriers and roads under this section. . . ."  Pub. L. 109-13, § 102, 119 Stat. 231, 306 (2005).

One year later, Congress enacted the Secure Fence Act "[t]o establish operational control over the international land and maritime borders of the United States."  Pub. L. No. 109-367, § 3, 120 Stat. 2638, 2638-39 (2006).  The Secure Fence Act amended 8 U.S.C. § 1103 note (Section 102(b)) to read:

(b)  CONSTRUCTION  OF  FENCING  AND  ROAD
IMPROVEMENTS *IN THE BORDER AREA*.- -

(1) SECURITY FEATURES.- -

(A) REINFORCED FENCING.- - In carrying out subsection (a),
the Secretary of Homeland Security shall provide for at least 2
layers of

reinforced fencing, the installation of additional physical barriers,
roads, lighting, cameras and sensors- - . . .

> (i) extending 15 miles northwest of the Laredo, Texas, port
> of entry to the Brownsville, Texas, port of entry.

(B) PRIORITY AREAS.- - With respect to the border described- -
. . .

> (ii) in subparagraph (A)(v), the Secretary shall ensure that
> fence construction from 15 miles northwest of the Laredo,
> Texas, port of entry to 15 southeast of the Laredo, Texas,
> port of entry is completed by December 31, 2008.

(C) EXCEPTION.- - If the topography of a specific area has an
elevation grade that exceeds 10 percent, the Secretary may use
other means to secure such area, including the use of surveillance
and barrier tools.

*Id.* (emphasis added).  In December of 2007, Congress passed its most recent amendments to 8

U.S.C. § 1103 note (Section 102(b)) as part of the Consolidated Appropriations Act of 2008:

(b)  CONSTRUCTION  OF  FENCING  AND  ROAD
IMPROVEMENTS *ALONG THE BORDER*.- -

(1) ADDITIONAL FENCING *ALONG SOUTHWEST BORDER*

(A) REINFORCED FENCING.- - In carrying out subsection (a),
the Secretary of Homeland Security shall construct reinforced
fencing *along not less than 700 miles of the southwest border
where fencing would be most practical and effective* and provide
for the installation of additional physical barriers, roads, lighting
cameras, and sensors to gain operational control of the southwest
border.

3

(B) PRIORITY AREAS.- - In carrying out this section, the Secretary of Homeland Security shall- -

>(i) identify the 370 miles, or other mileage determined by the Secretary, whose authority to determine other mileage shall expire on December 31, 2008, *along the southwest border where fencing would be most practical and effective* in deterring smugglers and aliens attempting to gain illegal entry into the United States; and

>(ii) not later than December 31, 2008, complete construction of reinforced fencing along the miles identified under clause (i). . .

(D) LIMITATION ON REQUIREMENTS.- - Notwithstanding subparagraph (A), nothing in this paragraph shall require the Secretary of Homeland Security to install fencing, physical barriers, roads, lighting, cameras, and sensors in a particular location along an international border of the United States, if the Secretary determines that the use or placement of such resources is not the most appropriate means to achieve and maintain operational control over the international border at such location . . . .

Pub. L. No. 110-161, § 564, 121 Stat. 1844, 2090-91 (2007) (emphasis added). The landowners base their objections on these most recent amendments to 8 U.S.C. § 1103 note (Section 102(b)), asserting that the reinsertion of the phrase "along the border" creates a limit on the authority of the United States to take property for use in constructing a fence to secure the United States-Mexico border.

II.      JURISDICTION

The United States asserts that this Court lacks jurisdiction to resolve whether the subject takings are "along the border" within the meaning of 8 U.S.C. § 1103 note (Section 102(b)):

It is not for the courts to oversee the choice of the boundary line nor to sit in review on the size of a particular project area. Once the question of the public purpose has been decided, the amount and character of land to be taken for the project and the

4

need for a particular tract to complete the integrated plan rests in the discretion of the legislative branch.

*Berman v. Parker*, 349 U.S. 26, 34 (1954).  "[I]t is not for the judiciary to determine what is necessary for successful consummation of a project any more than it is the court's function to select the precise parcels to be condemned." *West, Inc. v. United States*, 374 F.2d 218, 222 (5th Cir. 1967) (citing *United States v. 6.74 Acres of Land*, 148 F.2d 618 (5th Cir. 1945)); *see United States v. 2,606.84 Acres of Land in Tarrant County, Texas (Tarrant County)*, 432 F.2d 1286, 1289 (5th Cir. 1970) ("It is perfectly clear that the judicial role in examining condemnation cases does not extend to determining whether the land sought is actually necessary for the operation of the project.")

While the Government's representation of the law is correct, there are certain exceptions. Landowners have the right to question whether, and the court has jurisdiction to hear claims that, a taking was invalid as not being for a purpose authorized by the statute under which the proceeding is sought.  *Catlin v. United States*, 324 U.S. 229, 240 (1945).  A court's ability to analyze a taking's 'purpose' is limited to "the sense of the overall project rather than in the sense of some minor part of the project." *Tarrant County*, 432 F.2d at 1290.  This limitation, as applied in *Tarrant County*, meant:

> if Congress had never authorized a dam on the Clear Fork of the Trinity River, then the landowner might here claim under the *Catlin* rule that his land was being taken for an unauthorized purpose.  However, once Congress approved the Benbrook Dam, the taking for any purpose associated with that project was an authorized purpose, and the landowner cannot be heard to complain that the condemnation was not necessary to the dam's construction or operation.

*Id.*

An exception to the general deference to the condemnation decisions of an agency exists when "the delegated official so overstepped his authority that no reasonable man could conclude that the land sought to be condemned had some association with the authorized project." *Id.* "There must be basic to the project pervasive deception, unreasoned decision, or will-of-the-wisp determination before these words of pejoration are brought into play." *Id.* The relationship of the taking to the project must be "so patently untenable that a reasonable person could not find an association between the project and the land." *Id.* at 1291.

Where land is in close proximity to a project and there is no evidence that the land taken was so disassociated with the project as to render the taking arbitrary or capricious, the "judiciary may not substitute its judgment" for that of an agency implementing an a project enacted by Congress. *Id.* at 1290. "Once this determination is made the judicial function is ended and the declaration of taking must be sustained." *Id.* "The court should not and may not interfere with the exercise of the discretion given to [an agency and its] experts." *Id.* at 1291. "If Congress wanted to dot every i and cross every t in the pursuit of a legislative command, it would have the power and right to do so; but the courts should only sparingly deny governments an operable orbit to accomplish a legislative end." *West, Inc.*, 374 F.2d at 222.

The landowners assert that the location of the subject property is so disassociated with the authority to construct a fence "along the border" that these takings are unauthorized even under the broad *Tarrant* standard. This Court, pursuant to *Catlin* and *Tarrant*, will exercise its narrow jurisdiction to determine whether the relationship of the subject property to the construction of a fence "along the border" is so "patently untenable" that no reasonable person could find an association between the project and the property to be taken. Unless the takings

6

are so disassociated with the fencing project as set out by Congress as to be arbitrary and capricious, this Court will not substitute its own, or the landowners', judgment as to what constitutes a taking "along the border."

III.    MEANING OF "ALONG THE BORDER"

The initial step in determining whether a taking is disassociated with the border fence project is to determine what Congress meant by using the term "along the border." Once the Court has determined what Congress intended this phrase to mean, the Court will next look to whether the subject takings are so disassociated with the border fence project as to be considered arbitrary and capricious.

To determine the meaning of the phrase "along the border" as used in 8 U.S.C. § 1103 note (Section 102(b)), the Court finds it helpful to review the progression of the terminology used to define the United States' ability to acquire property to secure the border beginning with the enactment of IIRIRA in 1996 and continuing through the most recent amendments to 8 U.S.C. § 1103 note (Section 102(b)).

A.    IIRIRA

1.    *General Acquisition Authority as Establish in IIRIRA*

IIRIRA gave the Attorney General the authority to acquire interests in land "adjacent to or in the vicinity of an international land border . . . ." Pub. L. No. 104-208, 110 Stat. 3009-555 (1996) (setting out what is currently codified at 8 U.S.C. § 1103(b)(1)). "Adjacent to" was not defined by IIRIRA. *See id.* "Adjacent to" is generally defined as lying near, close to, or adjoining. BLACK'S LAW DICTIONARY 44 (8th ed. 2004). "Adjoining" means touching or sharing a common boundary. *Id.* By adding the definition of "adjoining" to "adjacent to," the

Court finds that property "adjacent to" a particular landmark includes all property lying near, close to, touching, or sharing a common boundary with such a landmark.

"In the vicinity of" was also not defined by IIRIRA. *See* Pub. L. No. 104-208, 110 Stat. 3009-555 (1996). Merriam-Webster's Online Dictionary defines "vicinity" as a surrounding area or district.[2]

Combining these definitions of "adjacent to" and "in the vicinity of" gives the Court a view of what Congress intended by its general grant of authority to the Attorney General to acquire interests "adjacent to or in the vicinity" for the purpose of protecting the United States' international borders. *See* 8 U.S.C. § 1103(b)(1). Thus, IIRIRA gave the Attorney General the general power to acquire property interests in any land: (i) touching the border ("adjacent to") as well as power to acquire any property interest (ii) in the area situated near the border ("or in the vicinity"). *See id.* This language and its accompanying authority have not been amended since the original enactment of IIRIRA.[3] *See id.*

---

[2] MERRIAM-WEBSTER'S ONLINE DICTIONARY *at* http://www.merriam-webster.com/dictionary/vicinity.

[3] The United States asserts that it can use the general acquisition authority of 8 U.S.C. § 1103(b)(1) to acquire the subject takings even if the Court finds that the subject takings are unauthorized under 8 U.S.C. § 1103 note (Section 102(b)). Section 102(b) requires the Secretary of Homeland Security to construct a minimum number of miles of fencing in identified areas in the country. *See id.* The United States asserts that while Section 102 creates a specific requirement on the Secretary to act, it does not create any limit on the general acquisition authority granted by 8 U.S.C. § 1103(b)(1) to take land "adjacent to or in the vicinity" of an international border if deemed necessary by the Secretary to secure the borders of the United States. The United States contends that no provision in 8 U.S.C. § 1103 or § 1103 note (Section 102) limits the Government to only taking land for the construction of fencing pursuant to Section 102(b). According to the United States, property acquired pursuant to 8 U.S.C. § 1103(b)(1) for the construction of fencing simply would not count toward the miles of fencing required by 8 U.S.C. § 1103 note (Section 102(b)). As this Court finds the United States can acquire the subject takings pursuant to 8 U.S.C. § 1103 note (Section 102(b)), this Court does not need to reach this argument of the United States.

2.    *Original IIRIRA Directive to Construct Fencing*

"The use of different words within related statutes generally implies that different meanings were intended." *United States v. Bean*, 537 U.S. 71, 76 n.4 (2002) (internal citation omitted). IIRIRA also contained language directing the Attorney General to complete the construction, "along the 14 miles of the international land border of the United States, starting at the Pacific Ocean and extending eastward, of second and third fences, in addition to the existing reinforced fence, and for roads between the fences." " Pub. L. No. 104-208, 110 Stat. 3009-555 (1996) (setting out 8 U.S.C. § 1103 note (Section 102(b)).

When referring to the Attorney General's general acquisition power, Congress used the phrases "in the vicinity" and "adjacent to." When referring to the construction of the fence in San Diego, Congress used the phrase "along the . . . international land border." Since the terms "along," "adjacent to," and "in the vicinity of" are all used in the same statute, the term "along" has a separate and distinct meaning from the other terms. *See Bean*, 537 at 76 n.4. Congress, thus, intended for "along the border" to have some other meaning than the definition of "adjacent to" as determined above (i.e., lying near, close to, touching or sharing a common boundary).

As set out in IIRIRA, "along" clearly included enough land for the construction of "second and third fences" along the border in San Diego, California, with at least room for the construction of roads between the second and third fences. Congress must have understood "along" to mean something akin to following the border, at some distance away from the border, as literally placing a second and third fence separated by a road "on the border" would have otherwise been impossible. *See* Pub. L. No. 104-208, 110 Stat. 3009-555 (1996). Congress did

9

not indicate a specific intent with respect to what distance from the border would still constitute following the border, apart from the direction that there be room between the second and third fences for roads. *See id.* Therefore, as initially enacted in IIRIRA, this Court finds that "along the border" meant following the border, with at least enough distance from the border to complete the contemplated project.

      B.    <u>The Secure Fence Act</u>

     The Secure Fence Act of 2006 amended 8 U.S.C. § 1103 note (Section 102(b)(2)) by expanding the Secretary's requirement to construct fencing to include the entire southwestern border of the United States. Pub. L. No. 109-367, 120 Stat. 2638-39 (2006).[4]   The Secretary of Homeland Security now was required to construct fencing "in the border area," including the area extending 15 miles northwest of the Laredo, Texas port of entry to the Brownsville, Texas port of entry. *Id.* The Secure Fence Act removed any use of term "along" from 8 U.S.C. § 1103 note (Section 102). *See id.* This left the Secretary with only a directive to construct fencing "in

---

[4]    The Court notes that the landowners also assert that amendments in the Emergency Supplemental Appropriations Act for Defense, the Global War on Terror, and Tsunami Relief, 2005 (the "Emergency Act") should factor into this Court's determination of the meaning of "along the border." *See* Pub. L. No. 109-13, § 102, 119 Stat. 231, 306 (2005). In the Emergency Act, Congress gave the Secretary of Homeland Security the authority to "waive all legal requirements such Secretary, in such Secretary's sole discretion, determines necessary to ensure expeditious construction of the barriers and roads under this section . . . ." *Id.* (amended 8 U.S.C. § 1103 note (Section 102)). The Act made no other amendment or modification to 8 U.S.C. § 1103 or its note. *See id.*

    The landowners assert that "[l]ogically, the more waiver authority that Congress gave the Government to construct the fences, the less discretion the agencies need as to permissible fencing sites. . . . the extraordinary breadth of the waiver authority given the Government itself cautions against expansive interpretation of the statute limiting where that broad discretion may be exercised." They provide no supporting authority for this "more waiver authority means less discretion" argument. While it is theoretically possible that Congress could have intended an increase in waiver authority to decrease the Secretary's discretion with respect to locating any border fencing, such a connection is in no sense the only logical conclusion. In fact, such a theory is belied by the Emergency Act itself. When Congress provided the Secretary of Homeland Security with expansive waiver authority, it did not amend any of the Secretary's requirements with respect to the construction of the border fence or alter the Secretary's discretion with respect to the location of the fence. Courts are to assume that Congress is aware of existing law when it passes legislation. *Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990). Thus, the granting of extensive waiver authority on top of the existing discretion could easily be viewed as a congressional attempt to *broaden* the Secretary's authority and discretion, rather than demonstrate any congressional intent to decrease or limit the Secretary's discretion.

the border area." *See id.* While the definition of "in the border area" was left open, the landowners provided other statutory sources to support a finding that "in the border area" includes locations up to 100 miles from the border.[5]

C.     Consolidated Appropriations Act of 2008

The Consolidated Appropriations Act of 2008 removed the phrase "in the border area" and replaced it with three variations of the phrase "along the . . . border." Pub. L. No. 110-161, § 564, 121 Stat. 1844, 2090-91 (Dec. 26, 2007) (amending 8 U.S.C. § 1103 note (Section 102)). This Court now turns to the question of what Congress intended "along the border" to mean when it reinserted the phrase into 8 U.S.C. § 1103 note (Section 102(b)).  The pertinent section reads:

> (b)   CONSTRUCTION   OF   FENCING   AND   ROAD IMPROVEMENTS *ALONG THE BORDER*.- -
>
> (1) ADDITIONAL FENCING *ALONG SOUTHWEST BORDER*
>
> (A) REINFORCED FENCING.- - In carrying out subsection (a), the Secretary of Homeland Security shall construct reinforced fencing *along not less than 700 miles of the southwest border where fencing would be most practical and effective* and provide for the installation of additional physical barriers, roads, lighting cameras, and sensors to gain operational control of the southwest border.

---

[5] The court may impart the same meaning to the same phrase throughout related statutes, *United States v. Thomas*, 932 F.2d 1085, 1088 (5th Cir. 1085) (citing *Sorenson v. Sec'y of the Treasury*, 475 U.S. 851, 860 (1986)), as courts are to assume that Congress is aware of existing law when it passes legislation. *Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990). Congress has previously defined the "border area" as: (1) the area located in the United and Mexico within 100 kilometers of the border between the United States and Mexico, 22 U.S.C. § 290n-6; (2) any portion of a border State within 100 miles of an international land border, 23 U.S.C. § 101(G)(1); (3) 100 miles from any external boundary of the United States, 8 C.F.R. § 287.1(a)-(b); (4) within twenty-five, 25, miles of the international border, 8 U.S.C. § 1357(a)(3); and (5) within 25 miles of the border, 8 C.F.R. § 235.1(h)(iii)(A).

11

(B)  PRIORITY  AREAS.- -  In  carrying  out  this  section,  the
Secretary of Homeland Security shall- -

> (i) identify the 370 miles, or other mileage determined by
> the Secretary, whose authority to determine other mileage
> shall expire on December 31, 2008, *along the southwest*
> *border where fencing would be most practical and effective*
> in deterring smugglers and aliens attempting to gain illegal
> entry into the United States; and

> (ii)  not  later  than  December  31,  2008,  complete
> construction  of  reinforced  fencing  along  the  miles
> identified under clause (i) . . .

8 U.S.C. § 1103 note (Section 102(b)) (emphasis added).

Initially, the Court notes its analysis from above showing that "along the border" in

IIRIRA meant not only following the border, but also included land some distance away from

the border.  Neither party refers to this original use of "along" in their briefings to the Court on

this issue.

The landowners instead assert that "along" is defined as "in a line matching the length or

direction of" and "at a point or points on."  MERRIAM-WEBSTER ONLINE DICTIONARY (2008).

They  assert  that  by  using  the  phrase  "along  the  border,"  Congress  intended  the  fence  be

constructed either directly on the border or touching the border.

The Court, therefore, will analyze whether in reinserting "along the border" in 8 U.S.C. §

1103 note (Section 102(b)), Congress intended to adopt any of the following three interpretations

of "along:" (1) following the border, but including land at some distance away from the border;

(2) directly on the border; or (3) touching, or close as possible to, the border.

12

1.      *Following the Border, But Including Land At Some Distance Away From the Border*

The use of a term in one provision of a statute may be clarified by how the term is used in another provision of the statute. *See United States v. Cooper Corp.*, 312 U.S. 600, 606 (1941). It is unclear whether this general rule of statutory construction applies to the use of a similar term in *prior versions* of the same statute.  Here, Congress used the phrase "along the border" when it originally enacted 8 U.S.C. § 1103 note (Section 102(b)).  This phrase was removed and later reinserted by the most recent amendments to 8 U.S.C. § 1103 note (Section 102(b)) through the Consolidated Appropriations Act of 2008.

The original reference to "along the border" required construction "along the 14 miles of the international land border of the United States, starting at the Pacific Ocean and extending eastward, of second and third fences, in addition to the existing reinforced fence, and for roads between the fences."  The most recent references to "along the border" require the Secretary of Homeland Security to:

> [C]onstruct reinforced fencing along not less than 700 miles of the southwest border where fencing would be most practical and effective and provide for the installation of additional physical barriers, roads, lighting, cameras, and sensors to gain operational control over the southwest border; [and]

> [I]dentify the 370 miles, or other mileage determined by the Secretary, whose authority to determine other mileage shall expire on December 31, 2008, along the southwest border where fencing would be most practical and effective in deterring smugglers and alien attempting to gain illegal entry into the United States . . . . "

> [N]othing in this paragraph shall require the Secretary of Homeland Security to install fencing, physical barriers, roads, lighting, cameras, and sensors in a particular location along an international border of the United States, if the Secretary determines that the use or placement of such resources is not the

13

> most appropriate means to achieve and maintain operational
> control over the international border at such location.

8 U.S.C. § 1103(b)(1)(A), (B)(i), (D) (emphasis added).

As discussed above, when Congress initially used the phrase "along the border" in IIRIRA, it clearly meant following the border, but included land at some distance from the border, as the specific requirements included a second and third fence with roads in between. Obviously, the two new fences and the roads in between could not all be placed literally on the border. There is nothing in the text of the new amendments to 8 U.S.C. § 1103 note (Section 102(b)) to indicate that Congress intended to change its original use.

By reusing the phrase "along the border" in the Consolidated Appropriations Act amendments, particularly in conjunction with the language giving the Secretary discretion to place the fencing where it would be "most practical and effective," Congress could certainly have intended the phrase "along the border" to have the same meaning as its original use in IIRIRA (i.e , following the border, but including land some distance away from the border). Since this definition, however, is no longer mandated by the text, the Court will consider whether either of the landowners' alternate interpretations of the phrase "along the border" would be more appropriate.

2.    *On the Border*

The landowners assert that it has been the practice of the Department of Homeland Security in other states (e.g., California, Arizona and New Mexico) to put any fencing directly

14

on the border.[6]  They contend that it would be inappropriate to permit the Secretary to deviate from such practice here in Texas.

It is initially unclear whether Congress could even authorize the Secretary of Homeland Security to take property directly on the border or place fencing on the border.  The actual border may not belong to either the United States or Mexico.  The "international boundary between the United States and Mexico in the limitrophe  sections of the Rio Grande and the Colorado River shall run along the middle of the channel occupied by normal flow [i.e., the middle of the Rio Grande river]. . . and from that time forward, this international boundary shall determine the sovereignty over the lands *on one side or the other of it*, regardless of the previous sovereignty over these lands."  *See* Treaty to Resolve Pending Boundary Differences and Maintain the Rio Grande and Colorado River as the International Boundary, United States of America, Mexico, art. II(A), November 23, 1970 [hereinafter Boundary Treaty].  Based on this language, the United States has sovereignty only over land *on one side* of the border and not the international boundary line itself.  It would appear that placing a fence directly on the border (i.e., down the middle of the Rio Grande river), as opposed to on the United States' side of the fence, could violate the Boundary Treaty.

Further, the Boundary Treaty recognizes that the path of the Rio Grande river will shift over time.  *Id.* at art. II, III.  Thus, the border (the middle of the river) shifts over time.  *Id.*  Even if the United States could build a fence on the international boundary line, since the middle of the river (and, thus, the border) shifts over time, the location of the fence would have to be

---

[6] Some landowners assert that instead of being directly on the border, fencing in California, New Mexico and Arizona is located a few feet from the border.  Placement of the fence a few feet from the border will be discussed as part of this Court's consideration of whether "along the border" means touching the border in the next section of the Court's analysis.

15

moved over time as the river shifts.   Whereas a border in the *terra firma* of California, Arizona and New Mexico will not change, the Texas-Mexico Rio Grande river border is potentially ever-changing.

It would, thus, be impracticable, if not a violation of the Boundary Treaty, to put a fence directly on the border.  Congress told the Department of Homeland Security to place the fence where it would be "most practical." *See* 8 U.S.C. § 1103 note (Section 102(b)(2)).  As this Court must assume that Congress knew of the ramifications of the Boundary Treaty and the potential for changes to the border based on the shifting Rio Grande, this clearly advises against adopting a definition of "along the border" that would require the placement of the fence on the international boundary line.

3.      *Touching, or as Close as Possible to, the Border*

Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion. *Medical Center Pharm. v. Mukasey*, 536 F.3d 383, 398 n.33 (5th Cir. 2008).   Where "terms are used in similar context within the same [statute], it is logical to assume that Congress intended that the terms have different and distinct meanings." *Koonce v. Quaker Safety Products & Mfg. Co.*, 798 F.2d 700, 720 (5th Cir. 1986) (internal citations omitted).

The phrase "adjacent to" has been a part of 8 U.S.C. § 1103 since the original enactment of IIRIRA. *See* 8 U.S.C. § 1103(b)(1).  The Consolidated Appropriations Act has now added the phrase "along the border" without removing the phrase "adjacent to."  This Court must assume that Congress knew the term "adjacent to" already existed as part of § 1103 when it added the

16

new "along the border" term. *See Koonce*, 798 F.2d at 720; *see also Medical Center Pharm.*, 536 F.3d at 398 n.33. "Along the border" must therefore have a "different and distinct meaning" from the already-existing phrase "adjacent to." *Id.*

As discussed above, the definition of "adjacent to" is lying near, close to, touching, or sharing a common boundary. Assuming that the drafters knew what they were doing, "along" cannot have this same definition. The Court, thus, must reject the landowners' proposed interpretation defining "along the border" as meaning touching, or as close as possible to, the border.

### 4.    *Conclusion*

Having rejected both of the landowners' proposed definitions of "along the border" (i.e., directly on the border and touching the border), the only interpretation remaining is the definition of "along" originally established by IIRIRA. The Court finds that it is appropriate to continue to use this original IIRIRA definition of "along the border," i.e., following the border, but including land at some distance away from the border, for the purpose of its continued analysis of the subject takings under the *Tarrant County* standard.

### D.    Analysis of the Subject Takings

Now, having determined that "along the border" means following the border, but may include land at some distance away from the border, the Court must apply this definition to its *Tarrant County* analysis of the relationship between the subject takings and the overall border fence project. Under the *Tarrant County* standard, the Court must now determine whether the subject takings are so disassociated with the border fence project as to be arbitrary and capricious. Applying the definition of "along the border" determined above, the border fence

17

project authorized by Congress under 8 U.S.C. § 1103 note (Section 102(b)) requires the Secretary to construct fencing on land that follows the border, but permits construction at some distance away from the border.

As evidence of the location of the subject takings in relation to the border, the landowners ask the Court to look at the aerial maps of the subject property interests submitted by the United States as part of its declaration of taking in each of these actions. Neither party submitted any affidavits, documentation, or other very specific evidence to provide the Court with the precise nature of the subject takings vis-a-vis this issue.

The aerial maps that are part of the declarations of taking do not permit the Court to make any precise determination of the location of the subject takings in relation to the border. The Court has been able to estimate in the above-referenced cases that the subject takings are located anywhere from approximately one-tenth of a mile to approximately one mile from the border. Comparing these takings to an overall border fence project directing the Secretary to acquire land following the border and build a fence where it is most practical and effective, the subject takings are not so egregious that no reasonable person could find the takings associated with the overall border fence project as authorized by Congress. The Court, therefore, cannot, and will not, substitute its own, or the landowners' judgment as to what the Secretary believes constitutes land "along the border."

IV.   ABANDONMENT OF UNITED STATES LAND

The landowners lastly assert that if the objective of the fencing statutes is to provide security for the entire United States, the current fencing plan "abandons large portions of land" by "ced[ing] significant control over parts of the nation," apparently to Mexico. The purpose of

18

the fence is to secure the United States-Mexico border. The land between the fence and the Rio Grande River is not being legally ceded to Mexico. In fact, the land on the other side of the fence still belongs to the private United States landowners. While the Government has not conceded this point, the Court recognizes the existence of the argument that the fence effectively takes the landowners' land on the south side of the fence. Nevertheless, the United States is in discussion with many landowners regarding how those landowners will continue to *access their property*. An argument that the Government is abandoning parts of the United States does not comport with continued ownership of such property and the discussions of how landowners will continue to be able to access their property between the fence and the Rio Grande river. The landowners' abandonment objection lacks merit and is overruled, although the argument may become a factor when a fact-finder is called upon to decide the amount and value of the land taken.

V.     CONCLUSION

Justice Kennedy once opined that the exercise of judicial power is often difficult. He wrote, "[W]e cannot ask another Branch to share responsibility, as when [as here] the argument is made that a statute is flawed or incomplete . . . . The hard fact is that sometimes we must make decisions we do not like. We make them because they are right, right in the sense that the law and the Constitution, as we see them, compel the result. And so great is our commitment to the process that, except in the rare case, we do not pause to express a distaste for the result, perhaps for fear of undermining a valued principle that dictates the decision." *Texas v. Johnson*, 491 U.S. 397, 420-21 (1989) (J. Kennedy, concurring).

This may, in fact, be one of those rare cases. The law and the Constitution compel a ruling against the landowners on this issue. The issue of national security as seen by our elected legislators and as expressed in their statutory dictates support the result the court has reached herein. Yet, the court finds no solace in these compelling reasons and neither will the owners of the land that is being sought. Construction of a fence some distance from the border does create, in effect, a "no-man's land" to which many landowners will have either limited or no practical access. The arguments against the practicality and efficacy of the proposed border fence are legion. With few exceptions, this court has yet to hear a compelling reason why the fence can not be built closer to the river. Suffice it to say that, once again, the nation has placed a burden on the citizens of south Texas that is clearly disproportional to that being borne by other locales.

Nevertheless, this Court is compelled by law and duty to overrule the objections of the landowners. Their legal objections are not supported by the law, and while their practical objections (e.g, that the placement of the fence creates a "no-man's land" and may ultimately be found to a taking of the land on the south side of the fence) may yet prove to be of some import in resolving future issues, the objections do not rise to a defense to the government's right to condemn in order to protect the national security of the country.

Congress authorized the Secretary of Homeland Security to construct fencing "along the border" to secure the United States-Mexico border. An analysis of the statutory progression of 8 U.S.C. § 1103 note (Section 102(b)) demonstrates that Congress intended that "along the border" to include land following the border, even if some distance away from the border—the same meaning Congress intended "along the border" to have when it originally enacted IIRIRA in 1996. The subject takings therefore are not so disassociated with the border fence project as to

20

be arbitrary and capricious under the *Tarrant* standard.   This court, thus, cannot, and will not, substitute its judgment for that the Secretary with respect to the acquisition of these subject takings.   The landowners objections to whether subject takings are authorized pursuant to the "along the border" language of 8 U.S.C. § 1103 note (Section 102(b)) are hereby overruled.

Signed, this 20th day of October, 2008.

Andrew S. Hanen
United States District Judge

21